UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-1235

DANIEL COCHRAN, on behalf of himself individually and all other similarly situated,

     Plaintiffs,

v.

HEWLETT-PACKARD COMPANY; HP ENTERPRISE SERVICES, LLC; HP, Inc.; DXC TECHNOLOGY SERVICES, LLC; and PERSPECTA ENTERPRISE SOLUTIONS, LLC,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Daniel Cochran ("Mr. Cochran" or "Plaintiff"), by and though counsel, Hogue &

Belong and in support of his causes of action against Defendants, states and alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff Cochran files this Complaint against Defendants Hewlett-Packard

Company, HP Enterprise Services, LLC, HP, Inc., DXC Technology Services, LLC, and

Perspecta Enterprise Solutions, LLC (collectively "HP" or "Defendants") individually and on

behalf of all those similarly situated employees as a result of Defendants' discrimination against

them on the basis of age.  Defendants adversely altered the terms and conditions of Plaintiffs'

employment, denied Plaintiffs the opportunities that other employees outside their protected class received, and terminated their employment, in violation of state and federal law.

2.      Plaintiffs bring claims against Defendants pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA") and Colorado Fair Employment Practices Act (C.R.S. 24-34-402) for age discrimination.

## PARTIES

3.      Plaintiff Cochran is and, at all times relevant to the Complaint, was a resident of Colorado.  At all relevant times, Cochran was a member of the protected class of individuals recognized under the ADEA.  Plaintiff Cochran was 62 years old at the time he was terminated by HP.

4.      At all material times, HP conducted business within the United States.  One of HP's headquarters and principal place of business is located in Fort Collins, Colorado.  Fort Collins is a location where HP directs, controls, and coordinates its business operations.

///

///

///

///

///

///

///

///

5.      HP has gone through significant corporate restructuring.  Below is an organizational chart of that restructuring:



6.      All the aforementioned entities share a unity of interest and all are co-conspirators for the acts described below.

## JURISDICTION AND VENUE

7.      Jurisdiction of this Court is invoked for pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4), 2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq.

8.      This is a suit authorized and instituted pursuant to the Age Discrimination in

Employment Act of 1967, 29 U.S.C. § 621, et seq.

9.      Venue is proper the District of Colorado pursuant to 28 U.S.C. § 1391(b)

because a substantial part of the employment practices and other conduct alleged to be

unlawful occurred in this District.

## ADMINISTRATIVE PREREQUISITES

10.      On April 10, 2020, Mr. Cochran filed a dual charge against HP with both the

U.S. Equal Employment Opportunity Commission ("EEOC") and the Colorado Department

of Regulatory Agencies, Civil Rights Division ("CDCR") concerning HP's policy that

targeted himself and other employees aged 40 years and older through a pattern and practice

of unlawful terminations. The EEOC issued Mr. Cochran a letter confirming his right-to-sue

under federal and state laws on April 22, 2020.

## FACTUAL ALLEGATIONS

**Daniel Cochran Was a Talented and Experienced Employee That Had Loyally Served
HP for over 26 years, Until Being Discriminated Against Because of His Age.**

11.      Mr. Cochran was born on May 21, 1957, and is currently 62 years old.

12.      Mr. Cochran was first hired by HP as an independent contractor in November

1992.  On or about January 16, 1996, HP hired Mr. Cochran to a full-time employee position.

13.      In or around August 2001, HP terminated Mr. Cochran's employment as part

of a companywide layoff.   However, less than a year later, in or around June 2002, HP

rehired Mr. Cochran as an independent contractor.  Between June 2002 and October 2011,

Mr. Cochran consistently performed work for HP as an independent contractor.

14.      In or around October 2011, HP rehired Mr. Cochran as a full-time employee to

the position of Technology Consultant IV.   In this position, Mr. Cochran was hired at an

Expert Job Level to perform onsite work for HP's clients related to software customization

and implementation.

15.     On or about December 16, 2015, HP promoted Mr. Cochran to Technical Marketing Engineer in its Software Defined & Cloud Group.  As part of his promotion, HP promised Mr. Cochran that he would be promoted to a Master Job Level.

16.     Shortly after Mr. Cochran was promoted, Hewlett-Packard Company split into HP Enterprise Services, LLC, and HP, Inc.  As a result of the reorganization, on or about November 1, 2017, HP assigned Mr. Cochran to a new manager, Vinay Jonnakuti.

17.     At the time, Mr. Cocharan was 60 years old and was the oldest employee in his team.  On Mr. Cochran's information and belief, at the time, Mr. Jonnakuti was approximately 40 years old.

18.     Shortly after Mr. Jonnakuti became Mr. Cochran's direct supervisor, Mr. Jonnakuti began to discriminate against Mr. Cochran because of his age.  Upon becoming Mr. Cochran's supervisor, Mr. Jonnakuti indicated to Mr. Cochran that he would not be supporting Mr. Cochran's promotion to a Master Job Level.  Ultimately, without Mr. Jonnakuti's support, Mr. Cochran's promotion to a Master Job Level never came to fruition.

19.     On one occasion, Mr. Jonnakuti removed Mr. Cochran from a project he had been working on after he had secured the laboratory for the project, and then Jonnakuti assign the project to a much younger employee.  Mr. Cochran reasonably believes that Mr. Jonnakuti removed Mr. Cochran from this project to discriminate against him because of his age.

20.     Moreover, HP repeatedly discriminated against Mr. Cochran by denying him career advancement opportunities that were granted to younger employees.  For instance, on two occasions, Mr. Cochran attempted to participate in HP's TechFluence, career advancement program.  Both times, Mr. Cochran was denied the opportunity to participate in this program.  Mr. Cochran reasonably believes that Defendants denied him an opportunity to

participate in TechFluence because of his age.  On Mr. Cochran's information and belief,
younger employees were allowed to participate in this program.  During one of the
information meetings for TechFluence program, Mr. Cochran was the oldest person attending
the meeting.

21.    Throughout his employment with HP, Mr. Cochran performed his duties in a
satisfactory and competent manner.

**HP's Employees Were Older, More Experienced, and Therefore More Expensive than the
Employees at HP's Competitors.**

22.    In 2012, the median age of HP's workforce was 39 years old, the oldest in the
tech industry.  With one-half of its workforce over the age of 39, HP's labor costs were
higher than other tech companies.  HP employees with 10-19 years of experience are paid an
average of just over $97,000 annually while employees with 20 or more years of experience
are paid an average of just over $110,000 annually.  By contrast, HP employees with less
than 1 year of experience are paid an average of just over $64,000 while employees with 1-4
years of experience are paid an average of just over $65,000.

**HP's Workforce Reduction Plan Sought to Replace Older, Experienced Employees with
Younger, Cheaper Ones.**

23.    On or about February 1, 2016, HP continued deploying its Workforce
Reduction Plan ("Workforce Reduction Plan"), which was a scheme to terminate its older,
higher paid employees and replace them with younger, lower paid employees.  HP's
Workforce Reduction Plan involuntarily terminates employees on a rolling basis.  Although
HP's Workforce Reduction Plan purports to lay off employees on a neutral basis, it actually
is a companywide practice that disproportionately targets employees who are 40 years of

age or older – a protected class – for termination.

24.     HP has stated that its purpose in instituting the Workforce Reduction Plan was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough.  If [HP is] to position [itself] as the industry leader for the future, then [HP] must take additional actions that, while tough, are necessary to move [its] business forward.  These actions include a reduction in [HP's] global workforce."

25.     On October 9, 2013, in anticipation of continuing deployment of its Workforce Reduction Plan, HP's then-CEO Meg Whitman described HP's staffing objectives at the company's "Hewlett-Packard Securities Analyst Meeting".  **Whitman explained that HP was aggressively seeking to *replace* older employees with younger employees**.  On this topic, some of Whitman's comments include, but are not limited to:

- ". . . a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know."

- ". . . we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever."

- "And over the years, our labor pyramid . . . [has] become a bit more of a diamond.  And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any company and particularly in ES.  If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges."

- "So, this has a couple of things.  One is we get the new style of IT strength and skills.  It also helps us from a cost perspective . . . if your labor pyramid isn't the right shape, you're carrying a lot of extra cost.  The truth is we're still carrying a fair amount of extra costs across this

company because the overall labor pyramid doesn't look the way it should."

- "Now, that's not something that changes like that.  Changing the shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring.  And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills."

26.    HP's CFO Cathie Lesjak ("Lesjak") explained the scheme as a way to proactively shift the makeup of HP's workforce towards low-level recent graduates:

> "And the way I think about the restructuring charge . . ., it's basically catching up.  It's actually dealing with the sins of the past in which we have not been maniacally focused on getting the attrition out and then just agreeing to replace anyway and not thinking through it carefully and thinking through what types of folks we hire as replacements . . . We hire at a higher level than what we really need to do.  And the smarter thing to do would be to prime the pipeline, bring in fresh new grads, and kind of promote from within as opposed to hiring a really experienced person that is going to be much more expensive."

27.    HP's Manager of Employee Relations for the Americas, Sheri Bowman, explained that it was critical for some HP organizations to reduce expenses, and one way they had done so was by changing the composition of their workforce:

> The focus within the different organizations has evolved a lot over the past four or five years because of the turnaround that we have been trying to achieve within the organization.  And so there is a tremendous focus on increasing revenue, increasing client satisfaction to help increase revenue and reducing, you know, overall expenses.  So that has just resulted in some organizations modifying their workforce to try to get to the right labor pyramid to achieve their business goals.

///

**HP Executed the Workforce Reduction Plan That Targeted Older Employees.**

28.     In October 2019, HP was still persistently eliminating the jobs of older, age-protected employees, like Mr. Cochran, and actively replacing them with younger employees.  Ms. Whitman confirmed as much in her public statements intended to reach the ears of HP investors:

> "That should be it.  I mean, that will allow us to right size our enterprise services business to get the right onshore/offshore mix, to make sure that we have a labor pyramid with lots of young people coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company . . . This will take another couple of years and then we should be done."

29.     Consistent with HP's strategy to eliminate the older members of its workforce in favor of younger workers, when selecting which employee to terminate under its Workforce Reduction Plan, HP's goal is to single out those workers who it thinks "will not fit the bill long term in [the] team growing to [an advisory] position."

30.     Although purportedly neutral on their face, HP's terminations under its Workforce Reduction Plan are actually targeted to eliminate older, age-protected workers in grossly disproportionate numbers.

31.     HP's Workforce Reduction Plan is implemented on a rolling basis.  That is, it does not terminate HP's employees all at once.  But, it serves as a mechanism for HP to terminate members of a protected class of employees whenever it wants.  Plaintiff is informed and believes that HP is *still* engaged in the systematic elimination of its age protected class of employees.

32.     Also, HP implements its Workforce Reduction Plan to carefully avoid triggering a Workforce Adjustment and Retraining Notification ("WARN") event.  A WARN Act event is triggered when a covered establishment terminates 50 employees in the same geographic region at any one time.  If a WARN Act event is triggered, the company must provide terminated

employees with at least 60 days' notice of his or her termination, and pay them for 60 days' worth of pay.  HP actively evades these requirements by not terminating 50 or more employees at any one time in the same geographic area.

### HP's "Fake" Measures that Purportedly Helped Terminated Employees to Retain Employment in a Different Capacity were Illusory and Restricted Competition.

33.     Theoretically, HP employees terminated under the Workforce Reduction Plan were encouraged to apply for other jobs at HP through HP's 60-day "Preferential Rehire Period."  A termination is cancelled for any HP employee who is hired during this "Preferential Rehire Period."  While the Preferential Rehire Period is supposed to be neutral in its application, it is not applied neutrally because it adversely impacts disproportionate numbers of age protected employees.  In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired.  If older employees are even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated.

34.     Since August 2013, HP's Human Resources has incorporated written guidelines that require HP to hire mostly younger employees.  Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees."  Thus, age-protected employees who were terminated under the Workforce Reduction Plan and who sought rehiring under the Preferential Rehiring Period, were fighting an uphill battle against HP's inherent prerogative to hire a disproportionate percentage of younger "early career" and "recent graduates".[1]

35.     Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs.  Accordingly, age-

---

[1]     Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

protected employees were rejected for rehiring under the Preferential Rehire Period provision of the Workforce Reduction Plan in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision.

36.      HP also implemented an early retirement program in which employees of a certain age and tenure are eligible to "voluntarily" retire early.  If the employee does not choose voluntary early retirement, he or she may soon be unemployed.  This retirement program presents age-protected employees with a Hobson's choice: either participate in the voluntary retirement program or risk being terminated under the Workforce Reduction Plan.  The aforementioned dilemma works to HP's advantage.

**HP Has Deliberately Avoided Confronting the Reality that Its Policies Disproportionately Impact Age Protected Employees.**

37.      Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the Workforce Reduction Plan.  In the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the Workforce Reduction Program.

38.      HP has an "Adverse Impact Team" that evaluates various HP employment practices to determine whether or not those practices impact a significant number or percentage of a particular protected class of employees.  Although HP has an "Adverse Impact Team," for unknown reasons, it does not investigate the facts related to whether or not the Workforce Reduction Plan adversely affects a class of *age* protected employees disproportionately.

39.      According to its "HP 2016 Sustainability Report," HP provides workforce data regarding its diversity in the United States, but tellingly provides no facts about its age-protected workforce data.

40.     On or about February 2017, HP set forth a "diversity mandate" when it hires

outside attorneys to defend it from lawsuits.  If a law firm does not fit HP's selective

"diversity" requirements then it can withhold ten percent (10%) of the firm's attorneys' fees.

Tellingly, "age" is not one of the criteria or factors included in this "diversity mandate."  This

omission further evidences HP's devaluation of age-protected class of persons.

41.     According to a January – February 2017 article published by AARP, HP has

received more allegations of age discrimination than *any* other technology company in recent

years.

**Mr. Cochran was Terminated under the Workforce Reduction Plan, and Was Not Rehired
During Either the Redeployment Period or the Preferential Rehire Period Because He Was
Replaced by Somebody Younger and Cheaper.**

42.     On or about October 22, 2019, Mr. Cochran was notified by his manager that

his employment was being terminated pursuant to the 2016 Workforce Reduction Plan, and

that his termination date would be November 1, 2019.

43.     Mr. Cochran was informed that he would have 60-days as part of his

"redeployment period" to find another job with HP.  If he was able to successfully find

another position during that time, then he would be allowed to continue to work without

interruption.  If he was not able to find another position at HP within the redeployment

period, then he would be terminated and the 60-day "Preferential Rehire Period" would

commence.  During that time, Mr. Cochran would be allowed to apply for jobs within HP,

and if he was selected then he would be re-hired without having to undertake the approval

process normally required for a rehire.

44.     During the 60-day "Preferential Rehire Period," Mr. Cochran applied for thirty-

two (32) jobs for which he was qualified.  Mr. Cochran interviewed for four (4) positions,

and received a second interview for one (1) position.  Furthermore, Mr. Cochran discussed

six (6) additional positions with HP's recruiters.  Despite, Mr. Cochran's immense effort to

find another position with HP, HP refused to rehire Mr. Cochran to discriminate against him

because of his age.  As a result, Mr. Cochran was not rehired by HP.

45.     At the time that Mr. Cochran was terminated, he was the oldest person in his

work group.  On Mr. Cochran's information and belief, the second oldest employee in his

team was also terminated as part of the Workforce Reduction Plan.  On Mr. Cochran

information and belief, younger employees that worked in Mr. Cochran's team were

reassigned to other departments within HP.


## CLASS ALLEGATIONS


46.     Plaintiff sue on his own behalf and on behalf of a Class of personas similarly

situated pursuant to Fed. R. Civ. P. Rule 23.

47.     Plaintiff is a representative of the following class for the purposes of the Age

Discrimination in Employment Act of 1967, 29 U.S.C. §§621-634 ("ADEA"):

<u>The Nationwide Class</u>

> All current, former, or prospective employees who worked for HP in
> the United States and present who were at least 40 years old at the time
> HP selected them for termination under HP's Workforce Reduction
> Plan. ("Age Discrimination Class").


48.     This action has been brought and may properly be maintained as a class action,

under Fed. R. Civ. P. Rule 23 because a well-defined community of interest in the litigation

exists and because the proposed class is easily ascertainable, and for the other reasons

explained in this Class Action Complaint.

49.   <u>Numerosity</u>:  The persons who comprise Age Discrimination Class are so numerous that joinder of all such persons would be unfeasible and impracticable.  The membership of Class is unknown to Plaintiff at this time.

50.   <u>Commonality</u>:  Common questions of fact or law arising from HP's conduct exist, as described in this Complaint, as to all members of the Class which predominate over any questions solely affecting individual members of the proposed class, including but not limited to:

- Whether HP's policies or practices relating to the Workforce Reduction Plan were based on discriminatory intent towards employees over 40 who were otherwise qualified for those positions;

- Whether HP's Workforce Reduction Plan had a disproportionate adverse impact on its employees aged 40 or older;

- Whether HP's policy of selecting employees to terminate under its Workforce Reduction Plan had a disproportionate adverse effect on those employees aged 40 or older;

- Whether HP's termination selection policy (i.e., the Workforce Reduction Plan) was a substantial factor in causing the Class member terminations (i.e., harm);

- Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace;

- Whether HP failed to implement policies and practices to prevent discrimination against older employees.

- Whether HP's Workforce Reduction Plan was an unfair, unlawful, deceptive, and or fraudulent business practice;

- Whether an alternative or modification to the Workforce Reduction Plan existed that would have had less of an adverse impact on employees aged 40 years and older;

51.   HP's defenses, to the extent that any such defense is applied, are applicable generally to the Class and are not distinguishable to any degree relevant or necessary to

defeat predominance in this case.

52.   Typicality:  Plaintiff's claims are typical of the claims for the members of the

Class all of whom have sustained and/or will sustain injuries, including irreparable harm, as a

legal (proximate) result of HP's common course of conduct as complained of in this

operative complaint.  Plaintiff's class claims are typical of the claims of Class because HP

used its policies and practices (i.e., its Workforce Reduction Plan, and accompanying

Preferential Rehire Period,) to subject Plaintiff and each member of the Class to identical

unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

53.   Adequacy:  Plaintiff, on behalf of all others similarly situated, will fairly and

adequately protect the interests of all members of the Class in connection with which they

have retained competent attorneys.  Plaintiff is able to fairly and adequately protect the

interests of all members of the Class because it is in Plaintiff's best interests to prosecute the

claims alleged herein to obtain full compensation due to them.  Plaintiff does not have a

conflict with either the Class members, and his interests are not antagonistic to either of the

Class.  Plaintiff has retained counsel who are competent and experienced in representing

employees in complex class action litigation

54.   Superiority:  Under the facts and circumstances set forth above, class action

proceedings are superior to any other methods available for both fair and efficient

adjudication of the controversy.  A class action is particularly superior because the rights of

each member of the Class, inasmuch as joinder of individual members of either Class is not

practical and, if the same were practical, said members of the Class could not individually

afford the litigation, such that individual litigation would be inappropriately burdensome, not

only to said citizens, but also to the courts of the United States.

55.   Litigation of these claims in one forum is efficient as it involves a single

decision or set of decisions that affects the rights of thousands of employees.  In addition,

class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgment concerning HP's practices.

56.     To process individual cases would increase both the expenses and the delay not only to members of the Class, but also to HP and the Court.  In contrast, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each member of the Class, all by way of the comprehensive and efficient supervision of the litigation by a single court.

57.     This case is eminently manageable as a class.  Defendants' computerized records, including meticulous payroll and personnel data, provide an accurate and efficient means to obtain information on the effect and administration of the Workforce Reduction Plan *en masse*, including class-wide damages, meaning class treatment would significantly reduce the discovery costs to all parties.

58.     In particular, since HP is obfuscating the import of its Workforce Reduction Plan, misleading its employees, suppressing their wages and mobility, the Class is neither sophisticated nor legally knowledgeable enough be able to obtain effective and economic legal redress unless the action is maintained as a class action.  Given the unlikelihood that many injured class members will discover, let alone endeavor to vindicate, their claims, class action is a superior method of resolving those claims.

59.     There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which HP's actions have inflicted upon Plaintiff and the Class.

60.     There is also a community of interest in ensuring that the combined assets and available insurance of HP are sufficient to adequately compensate the members of the Class

for the injuries sustained.

61.     Notice of the pendency and any result or resolution of the litigation can be provided to members of the Class by the usual forms of publication, sending out to members a notice at their current addresses, establishing a website where members can choose to opt-out, or such other methods of notice as deemed appropriate by the Court.

62.     Without class certification, the prosecution of separate actions by individual members of the Class would create a risk of: (1) inconsistent or varying adjudications with respect to individual members of Class that would establish incompatible standards of conduct for HP; or (2) adjudications with respect to the individual members of the Class that would, as a practical matter, be disparities of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interest.

63.     Plaintiff is a representative of the following class for the purposes of the Colorado Fair Employment Practices Act (C.R.S. 24-34-402):

<u>The Colorado Class</u>

> All current, former, or prospective employees who worked for HP in the State of Colorado and present who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. ("Age Discrimination Class").

64.     This action has been brought and may properly be maintained as a class action, under Fed. R. Civ. P. Rule 23 because a well-defined community of interest in the litigation exists and because the proposed class is easily ascertainable, and for the other reasons explained in this Class Action Complaint.

65.     <u>Numerosity</u>: The persons who comprise the Colorado Class are so numerous that joinder of all such persons would be unfeasible and impracticable. The Colorado Class consists of hundreds of former employees who were notified of their termination when they were age 40 and older.

66.     Commonality:  Common questions of fact or law arising from HP's conduct exist, as described in this Complaint, as to all members of the Class which predominate over any questions solely affecting individual members of the proposed class, including but not limited to:

- Whether HP's policies or practices relating to the Workforce Reduction Plan were based on discriminatory intent towards employees over 40 who were otherwise qualified for those positions;

- Whether HP's Workforce Reduction Plan had a disproportionate adverse impact on its Colorado employees aged 40 or older;

- Whether HP's policy of selecting employees to terminate under its Workforce Reduction Plan had a disproportionate adverse effect on those Colorado employees aged 40 or older;

- Whether HP's termination selection policy (i.e., the Workforce Reduction Plan) was a substantial factor in causing the Class member terminations (i.e., harm);

- Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace;

- Whether HP failed to implement policies and practices to prevent discrimination against older employees.

- Whether HP's Workforce Reduction Plan was an unfair, unlawful, deceptive, and or fraudulent business practice;

- Whether an alternative or modification to the Workforce Reduction Plan existed that would have had less of an adverse impact on employees aged 40 years and older;

67.     HP's defenses, to the extent that any such defense is applied, are applicable generally to the Class and are not distinguishable to any degree relevant or necessary to defeat predominance in this case.

68.     Typicality:  Plaintiff's claims are typical of the claims for the members of the Colorado Class all of whom have sustained and/or will sustain injuries, including irreparable

harm, as a legal (proximate) result of HP's common course of conduct as complained of in this operative complaint. Plaintiff's class claims are typical of the claims of Colorado Class because HP used its policies and practices (i.e., its Workforce Reduction Plan, and accompanying Preferential Rehire Period,) to subject Plaintiff and each member of the Colorado Class to identical unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

69. Adequacy: Plaintiff, on behalf of all others similarly situated, will fairly and adequately protect the interests of all members of the Colorado Class in connection with which they have retained competent attorneys. Plaintiff is able to fairly and adequately protect the interests of all members of the Colorado Class because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to them. Plaintiff does not have a conflict with either the Colorado Class members, and his interests are not antagonistic to either of the Colorado Class. Plaintiff has retained counsel who are competent and experienced in representing employees in complex class action litigation

70. Superiority: Under the facts and circumstances set forth above, class action proceedings are superior to any other methods available for both fair and efficient adjudication of the controversy. A class action is particularly superior because the rights of each member of the Colorado Class, inasmuch as joinder of individual members of either Class is not practical and, if the same were practical, said members of the Class could not individually afford the litigation, such that individual litigation would be inappropriately burdensome, not only to said citizens, but also to the courts of the State of Colorado.

71. Litigation of these claims in one forum is efficient as it involves a single decision or set of decisions that affects the rights of thousands of employees. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgment concerning HP's practices.

72.     To process individual cases would increase both the expenses and the delay not only to members of the Colorado Class, but also to HP and the Court.  In contrast, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each member of the Class, all by way of the comprehensive and efficient supervision of the litigation by a single court.

73.     This case is eminently manageable as a class.  Defendants' computerized records, including meticulous payroll and personnel data, provide an accurate and efficient means to obtain information on the effect and administration of the Workforce Reduction Plan *en masse*, including class-wide damages, meaning class treatment would significantly reduce the discovery costs to all parties.

74.     In particular, since HP is obfuscating the import of its Workforce Reduction Plan, misleading its employees, suppressing their wages and mobility, the Class is neither sophisticated nor legally knowledgeable enough be able to obtain effective and economic legal redress unless the action is maintained as a class action.  Given the unlikelihood that many injured class members will discover, let alone endeavor to vindicate, their claims, class action is a superior method of resolving those claims.

75.     There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which HP's actions have inflicted upon Plaintiff and the Class.

76.     There is also a community of interest in ensuring that the combined assets and available insurance of HP are sufficient to adequately compensate the members of the Class for the injuries sustained.

77.     Notice of the pendency and any result or resolution of the litigation can be

provided to members of the Class by the usual forms of publication, sending out to members a notice at their current addresses, establishing a website where members can choose to opt-out, or such other methods of notice as deemed appropriate by the Court.

78.     Without class certification, the prosecution of separate actions by individual members of the Class would create a risk of: (1) inconsistent or varying adjudications with respect to individual members of Class that would establish incompatible standards of conduct for HP; or (2) adjudications with respect to the individual members of the Class that would, as a practical matter, be disparities of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interest.

## FIRST CLAIM FOR RELIEF - AGE DISCRIMINATION UNDER ADEA

### (On behalf of Plaintiff and the Nationwide Class)

79.     Plaintiffs incorporate by reference all Paragraphs of this Complaint as if fully set forth herein.

80.     At all times relevant to this case, Plaintiffs have been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

81.     At all times relevant to this case, Defendants were "employers" within the meaning of the ADEA, 29 U.S.C. § 630(b).

82.     Although Plaintiffs at all relevant times successfully performed their jobs, they were terminated because of their age and were replaced by younger employees.

83.     Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under the ADEA based on Plaintiffs' age.

84.     Furthermore, Defendants' illegal actions against Plaintiffs were aimed at Plaintiffs because of their age, resulting in adverse impacts to the terms and conditions of Plaintiffs' employment.

85.     Defendants' above-described conduct was intentional and was motivated by Plaintiffs' age.

86.     Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiffs on the basis of their age.

87.     As a direct and proximate result of Defendants' above-described actions, Plaintiffs have suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and they are entitled to such general and special damages, economic damages, punitive damages, liquidated damages, and attorneys' fees and costs as permitted by law.

**SECOND CLAIM FOR RELIEF - AGE DISCRIMINATION UNDER COLORADO FAIR EMPLOYMENT PRACTICE ACT**

**(On behalf of Plaintiff and the Colorado Class)**

88.     Plaintiffs incorporate by reference all Paragraphs of this Complaint as if fully set forth herein.

89.     At all times relevant to this case, Plaintiffs have been at least 40 years of age and therefore protected by the Colorado Fair Employment Practices Act (C.R.S. 24-34-402).

90.     Although Plaintiffs at all relevant times successfully performed their jobs, they were terminated because of their age and were replaced by younger employees.

91.     Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under the Colorado Fair Employment Practices Act based on Plaintiffs' age.

92.     Furthermore, Defendants' illegal actions against Plaintiffs were aimed at Plaintiffs because of their age, resulting in adverse impacts to the terms and conditions of Plaintiffs' employment.

93.     Defendants' above-described conduct was intentional and was motivated by Plaintiffs' age.

94.     Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiffs on the basis of their age.

95.     As a direct and proximate result of Defendants' above-described actions, Plaintiffs have suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and they are entitled to such general and special damages, economic damages, punitive damages, liquidated damages, and attorneys' fees and costs as permitted by law.

**THIRD CLAIM FOR RELIEF – WRONGFUL TERMIANTION IN VIOLATION OF PUBLIC POLICY**

**(On behalf of Plaintiff and the Colorado Class)**

96.     Plaintiffs incorporate by reference all Paragraphs of this Complaint as if fully set forth herein.

97.     HP discriminated against Plaintiff and the Colorado Class members by terminating their employment of the basis of their age.

98.     HP's discrimination constitutes an unlawful employment practice in violation of Colorado public policy.

99.     Furthermore, Defendants' illegal actions against Plaintiffs were aimed at Plaintiffs because of their age, resulting in adverse impacts to the terms and conditions of Plaintiffs' employment.

100.     Defendants' above-described conduct was intentional and was motivated by Plaintiffs' age.

101.    Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiffs on the basis of their age.

102.    As a direct and proximate result of Defendants' above-described actions, Plaintiffs have suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and they are entitled to such general and special damages, economic damages, punitive damages, liquidated damages, and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself individually and on behalf of the Class prays for relief and judgment against Defendants and any later named defendant, jointly and severally as follows:

1.    Certification of the case as a class action and appointment of Plaintiff as Class Representative for the United States Class and his counsel of record as Class Counsel;

2.    Certification of the case as a class action and appointment of Plaintiff as Class Representative for the Colorado Class and his counsel of record as Class Counsel;

3.    All damages to which Plaintiff and each member of the United States and Colorado Classes are entitled due to Defendants' conduct, including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discrimination practices of Defendants;

4.    For restitution, including, without limitation, restitutionary disgorgement;

5.    For affirmative or prospective relief;

6.    For exemplary and punitive damages;

7.    For attorneys' fees, expenses, and costs of suit;

8.    For pre-judgment and post-judgement interest;

9.     An order enjoining Defendants from continuing the unfair, deceptive, fraudulent, and unlawful business practices alleged herein; and

10.     For all such other and further relief the Court may deem just and proper.


DATED: May 1, 2020                                    **HOGUE & BELONG**


                                                     ____s/ *Jeffrey L. Hogue* _____ ____
                                                     Jeffrey L. Hogue
                                                     jhogue@hoguebelonglaw.com
                                                     Tyler J. Belong
                                                     tbelong@hoguebelonglaw.com
                                                     Marisol Jimenez Gaytan
                                                     mjimenez@hoguebelonglaw.com
                                                     Attorneys for Plaintiff Cochran on behalf of
                                                     himself and all others similarly situated
                                                     c/o Hogue & Belong, APC
                                                     170 Laurel Street San Diego, CA 92101
                                                     (619) 238-4720



## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial.


DATED: May 1, 2020                                    **HOGUE & BELONG**


                                                     _s/ *Jeffrey L. Hogue* _____ ____
                                                     Jeffrey L. Hogue
                                                     jhogue@hoguebelonglaw.com
                                                     Tyler J. Belong
                                                     tbelong@hoguebelonglaw.com
                                                     Marisol Jimenez Gaytan
                                                     mjimenez@hoguebelonglaw.com
                                                     Attorneys for Plaintiff Cochran on behalf of
                                                     himself and all others similarly situated
                                                     c/o Hogue & Belong, APC
                                                     170 Laurel Street San Diego, CA 92101
                                                     (619) 238-4720