UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-1235

DANIEL COCHRAN,

     Plaintiffs,

v.

HEWLETT-PACKARD COMPANY; HP ENTERPRISE SERVICES, LLC; HEWLETT-PACKARD ENTERPRISE CO.; HP, Inc.; and DXC TECHNOLOGY SERVICES, LLC,

     Defendants.

---

## THIRD AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Daniel Cochran ("Mr. Cochran" or "Plaintiff"), by and though counsel, Hogue & Belong and in support of his causes of action against Defendants, states and alleges as follows:

### PRELIMINARY STATEMENT

1.    Plaintiff Cochran files this Third Amended Complaint against Defendants Hewlett-Packard Company ("HP Co."), Hewlett-Packard Enterprise Co. ("HPE"), HP Enterprise Services, LLC ("HPS"), HP, Inc. ("HPI"), and DXC Technology Services, LLC ("DXC") (collectively "HP" or "Defendants") individually as a result of Defendants' discrimination against them on the basis of age.  Defendants adversely altered the terms and conditions of

Plaintiff's employment, denied Plaintiff the opportunity that other employees outside his protected class received, and terminated his employment, in violation of state and federal law.

2.      Plaintiff brings claims against Defendants pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), Colorado Fair Employment Practices Act (C.R.S. 24-34-402) for age discrimination, and Colorado's common law prohibition of Wrongful Termination.

## PARTIES

3.      Plaintiff Cochran is and, at all times relevant to the Third Amended Complaint, was a resident of Colorado.  At all relevant times, Cochran was a member of the protected class of individuals recognized under the ADEA.  Plaintiff Cochran was 62 years old at the time he was terminated by HP.

4.      At all material times, HP conducted business within the United States.  One of HP's headquarters and principal place of business is located in Fort Collins, Colorado.  Fort Collins is a location where HP directs, controls, and coordinates its business operations.

///

///

///

///

///

///

5.      HP has gone through significant corporate restructuring.  Below is an

organizational chart of that restructuring:



6.      The above-referenced entities are one interrelated enterprise.  Despite the fact

that they are different entities, those differences are in name only.  All the aforementioned

entities share a unity of interest and all are co-conspirators for the acts described below.

7.      The above-referenced Defendants' entities also are the joint employers of each

other.  Those entities share common control, management, resources, employment policies

and a Workforce Reduction Plan that they act as one single integrated enterprise and the alter

egos of one another.

8.      In 2015, Hewlett-Packard Company  "split" in two companies – HPE and HPI.

This split, however, was in name only.  After the split, every shareholder who owned a share of Hewlett-Packard Company was assigned one share of HPE and one share of HPI.  These shareholders retain ultimate control of all significant decisions and equal financial control.

9.      HPI and HPE's corporate headquarters[1] and nerve centers are located in Palo Alto, California where they manage, direct, coordinate and control their business operations.

10.      Moreover, the chief executive officers of both HPE and HPI both worked for Hewlett-Packard Company at the time of the split and they closely communicated with one another about employees and business operations.

11.      All the aforementioned entities are interrelated and integrated such that each and every entity had the right to control each others' employees.  Further, the policies and practices that governed the rights of the employees were all the same.  In other words, all of the entities act in unison and operate, in reality, as a single entity.

12.      Additionally, HPE and HPI's hiring and firing decisions were made in tandem. The Workforce Reduction Plan (defined below) and the Preferential Rehire Period policy utilized by HP Co. were subsequently adopted and used by both HPE (and by extension HPS and DXC) and HPI.

13.      Further, HPE and HPI knew about each other's discriminatory practices described below, and ratified those practices.  Both entities promoted, perpetuated, and they helped facilitate one another's age discrimination.  Specifically, they both knew that they favored younger employees over and to the detriment of older employees.

---

[1]      In approximately March 2019, HPE moved its corporate headquarters from Palo Alto, California to San Jose, California.

## JURISDICTION AND VENUE

14.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 (federal question), 1343(3), and (4), 1441 (diversity), 2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq.

15.     This is a suit authorized and instituted pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq.

16.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because a substantial part of the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE PREREQUISITES

17.     On April 10, 2020, Mr. Cochran filed a dual charge against HP with both the U.S. Equal Employment Opportunity Commission ("EEOC") and the Colorado Department of Regulatory Agencies, Civil Rights Division ("CDCR") concerning HP's policy and practice that targeted himself and other employees aged 40 years and older through a pattern and practice of unlawful terminations. The EEOC issued Mr. Cochran a letter confirming his right-to-sue under federal and state laws on April 22, 2020 (the "Right to Sue").[2] Attached as Exhibit "A" is a true and correct copy of the Right to Sue.

## FACTUAL ALLEGATIONS

**Daniel Cochran Was a Talented and Experienced Employee That Had Loyally Served HP for over 26 years, Until Being Discriminated Against Because of His Age.**

18.     Mr. Cochran was born on May 21, 1957, and is currently 63 years old.

---

[2]     Pursuant to the worksharing agreement between the CCRD and EEOC, the EEOC's Right-to-Sue also exhausts administrative remedies for the state of Colorado. (*See* Exhibit "B.")

19.     Mr. Cochran was first hired by HP as an independent contractor in November 1992.  On or about January 16, 1996, HP hired Mr. Cochran into a full-time employee position.

20.     In or around August 2001, HP terminated Mr. Cochran's employment as part of a companywide layoff.   However, less than a year later, in or around June 2002, HP rehired Mr. Cochran as an independent contractor.  Between June 2002 and October 2011, Mr. Cochran consistently performed work at a high level for HP as an independent contractor.

21.     In or around October 2011, HP rehired Mr. Cochran from an independent contractor into a full-time employee to the position of Technology Consultant IV.  In this position, Mr. Cochran was hired at an Expert Job Level to perform onsite work for HP's clients related to software customization and implementation.

22.     On or about December 16, 2015, because Mr. Cochran was excelling at his job, HP promoted Mr. Cochran to Technical Marketing Engineer in its Software Defined & Cloud Group.  As part of his promotion, HP promised Mr. Cochran that he would be promoted to a Master Job Level.

23.     On or about November 1, 2017, HP assigned Mr. Cochran to a new manager, Vinay Jonnakuti.  At that time, Mr. Cochran was 60 years old, the oldest employee on his team.  On information and belief, Mr. Jonnakuti was approximately 40 years old at the time of her assignment as Mr. Cochran's manager.

24.     Shortly after Mr. Jonnakuti became Mr. Cochran's direct supervisor, Mr. Jonnakuti began to discriminate against Mr. Cochran because of his age.  For instance, Mr. Jonnakuti indicated to Mr. Cochran that he would not be supporting Mr. Cochran's promotion to a Master Job Level.  Ultimately, without Mr. Jonnakuti's support, Mr. Cochran's promotion to a Master Job Level never came to fruition, despite HP's earlier

promise.

25.     On another occasion, Mr. Jonnakuti removed Mr. Cochran from a project he had been working on after he had secured the laboratory for the project, and then Jonnakuti assigned the project to a much younger employee.  Mr. Jonnakuti removed Mr. Cochran from this project without any justifiable business reason other than to discriminate against him because of his age.

26.     Moreover, HP repeatedly discriminated against Mr. Cochran by denying him career advancement opportunities that were granted to younger employees.  For instance, on two occasions, Mr. Cochran attempted to participate in HP's TechFluence, career advancement program.  Both times, Mr. Cochran was denied the opportunity to participate in this program.  HP denied him an opportunity to participate in TechFluence because of his age.  On information and belief, younger employees were allowed to participate in this program.  During one of the informational meetings for TechFluence program, Mr. Cochran was the oldest person attending the meeting.

27.     HP's discriminatory treatment to its older employees became a companywide unwritten policy.  Comments directed to age protected workers such as, "when are you planning on retiring," "You must be getting ready to retire," and others were commonplace throughout HP.  The unwritten policy was so consistently applied that it was understood at HP that if there was another wave of workforce reductions HP would target the age protected employees first.

28.     In fact, between the July 1, 2012 and February 21, 2017, there were 29 age discrimination complaints against HP just in California.

29.     Throughout his employment with HP, Mr. Cochran performed his duties in a satisfactory and competent manner.  But for the fact that he was 40 years of age or older ("Age Protected Class"), Mr. Cochran would still be gainfully employed with HP.  In other

words, because he was in the Age Protected Class he was targeted and ultimately terminated.

**HP's Employees Were Older, More Experienced, and Therefore More Expensive than the Employees at HP's Competitors.**

30.     In 2012, the median age of HP's workforce was 39 years old, the oldest in the tech industry.  With one-half of its workforce over the age of 39, HP's labor costs were higher than other tech companies.  HP employees with 10-19 years of experience are paid an average of just over $97,000 annually while employees with 20 or more years of experience are paid an average of just over $110,000 annually.  By contrast, HP employees with less than 1 year of experience are paid an average of just over $64,000 while employees with 1-4 years of experience are paid an average of just over $65,000.

**HP's Workforce Reduction Plan Sought to Replace Older, Experienced Employees with Younger, Cheaper Ones.**

31.     HP terminates its employees in a so-called structured lay-off that HP calls Workforce Reduction Plan.

32.     HP has stated that its purpose in instituting the Workforce Reduction Plan was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough.  If [HP is] to position [itself] as the industry leader for the future, then [HP] must take additional actions that, while tough, are necessary to move [its] business forward.  These actions include a reduction in [HP's] global workforce."

33.     HP Co. utilized its Workforce Reduction Plan since 2012, and some version of that plan continues to this day.  The different versions of the Workforce Reduction Plan are not materially different.  HP utilized the same Workforce Reduction Plan for both HPE and HP, Inc. to eliminate employees in the Age Protected Class.

34.     HPE and HP, Inc. worked together to coordinate efforts to implement the Workforce Reduction Plan.

35.     On October 9, 2013, in anticipation of continuing deployment of its Workforce Reduction Plan, HP's then-CEO Meg Whitman described HP's staffing objectives at the company's "Hewlett-Packard Securities Analyst Meeting". **Whitman explained that HP was aggressively seeking to *replace* older employees with younger employees**. On this topic, some of Whitman's comments include, but are not limited to:

- ". . . a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know."

- ". . . we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever."

- "And over the years, our labor pyramid . . . [has] become a bit more of a diamond.  And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any company and particularly in ES.  If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges."

- "So, this has a couple of things.  One is we get the new style of IT strength and skills.  It also helps us from a cost perspective . . . if your labor pyramid isn't the right shape, you're carrying a lot of extra cost. The truth is we're still carrying a fair amount of extra costs across this company because the overall labor pyramid doesn't look the way it should."

    "Now, that's not something that changes like that.  Changing the shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring. And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills."

    o  "That should be it.  I mean, that will allow us to right size our enterprise services business to get the right onshore/offshore mix, to make sure that we have a labor pyramid with **lots of young people** coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company . . . This will take another couple of years and then we should be done."[3]

36.    HP's CFO Cathie Lesjak ("Lesjak") explained the scheme as a way to proactively shift the makeup of HP's workforce towards low-level recent graduates:

> "And the way I think about the restructuring charge . . ., it's basically catching up.  It's actually dealing with the sins of the past in which we have not been maniacally focused on getting the attrition out and then just agreeing to replace anyway and not thinking through it carefully and thinking through what types of folks we hire as replacements . . . We hire at a higher level than what we really need to do.  And the smarter thing to do would be to prime the pipeline, bring in **fresh new grads**, and kind of promote from within **as opposed to hiring a really experienced person** that is going to be much more expensive."

37.    HP's Manager of Employee Relations for the Americas, Sheri Bowman, explained that it was critical for some HP organizations to reduce expenses, and one way they had done so was by changing the composition of their workforce:

> The focus within the different organizations has evolved a lot over the past four or five years because of the turnaround that we have been trying to achieve within the organization.  And so there is a tremendous focus on increasing revenue, increasing client satisfaction to help increase revenue and reducing, you know, overall expenses.  *So that has just resulted in some organizations **modifying their workforce** to try to get to the right labor pyramid to achieve their business goals*.

---

[3]    Judge Freeman characterized Ms. Whitman's comments as "startling." *See Enoh v. Hewlett Packard Enter. Co.* (N.D.Cal. July 11, 2018, No. 17-cv-04212-BLF) 2018 U.S.Dist.LEXIS 115688, at *32.

38.      The employee selected to be terminated pursuant to the Workforce Reduction Plan is initially recommended by the managerial employees.  That manager or managers then notifies HP's human resource department of their selection.  The selection is then evaluated by the human resources generalist to assure the selection is the "right fit" for termination, meaning if the selection conforms with Meg Whitman's directive to terminate older employees while retaining the younger employees.  Notably, the selection is not based on merit or performance.  Rather, if the selected employee is old enough, then the human resource department approves the selection and notifies the Workforce Management Team to prepare the proper paperwork to be delivered to the selected employee by his or her manager(s).  Conversely, if the selection is too young, then the manager or managers are asked to select another employee.

39.      Further, internal HP documentation heavily favors employees from the younger "millennial" generation to other older generations.  To HP, employees from the millennial generation were highly desirable; as such, HP placed an emphasis on retaining and attracting as many "millennial" generation employees while terminating or retiring employees from the older generations.

40.      On or about February 1, 2016, HP continued deploying its Workforce Reduction Plan, which was still a scheme specifically targeted to terminate its older and replace them with younger, lower paid employees.  HP's Workforce Reduction Plan involuntarily terminates employees on a rolling basis.  Although HP's Workforce Reduction Plan purports to lay off employees on a neutral basis, it actually is a companywide mechanism by which HP carries out its above-described policy of disproportionately and discriminatorily targeting employees in the Age Protected Class for termination.

41.      HP maintains meticulous records about each employee, including his or her date of birth and age.  Pursuant to HP's policy, those high-level HP employees responsible

for carrying out the implementation of the Workforce Reduction Plan used this age data in order to act with the specific intent to terminate those employees of the Age Protected Class, not for any work-related reason.

42.    As an example, as of 2015, out of all of the employees HP terminated pursuant to the Workforce Reduction Plan in a single State, 85% of those terminated were in in the Age Protected Class.

43.    Further, pursuant to the Older Workers Benefit Protection Act ("OWBPA") in a group layoff (which the Workforce Reduction Plan was), HP was required to advise those affected employees of who in their "Decisional Unit" was also laid off and who was kept, identified by title and age.  29 C.F.R. § 1625.22 defines "Decisional Unit" as "that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver.  The term 'decisional unit' has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program."

44.    The attachments identifying the "decisional unit" that HP provides to those employees it selects for the Workforce Reduction Plan are grossly inadequate, deceptively small, and intended to mislead the Age Protected Class in violation of the OWBPA.  For instance, the Workforce Reduction Plan is a structured layoff for thousands of employees being terminated by HP throughout Colorado and the nation.  As part of the Workforce Reduction Plan, these thousands of employees selected for termination nationwide are offered a small severance in exchange for signing a liability waiver.  But, contrary to the requirements of the OWBPA, the HP employees selected for the Workforce Reduction Plan are provided a deceptively small list of the employees and ages of those who are terminated.  Rather than providing a larger department or division wide list comprising the true

"decisional unit," HP provided each terminated employee only a tiny fraction of this list, often times containing less than 10 employees/ages.  HP did this in order to conceal its discriminatory practices in Colorado and throughout the nation.  In Mr. Cochran's case, only 6 employees and ages were identified as the "decisional unit."  This sparse, deceptive, and incomplete disclosure clearly violates the OWBPA.

45.     Notwithstanding the foregoing, even a preliminary investigation into those sparse and incomplete disclosures of the ages of employees selected for termination and the signing of a severance/waiver agreement reveal that older employees were substantially overrepresented for selection for termination under the Workforce Reduction Plan.  In other words, available data shows that older workers were substantially more likely than younger workers to be terminated under the Workforce Reduction Plan.

**HP Executed the Workforce Reduction Plan That Targeted Older Employees.**

46.     In October 2019, HP was still consistently eliminating the jobs of older, age-protected employees, like Mr. Cochran, and actively replacing them with younger employees.

47.     Consistent with HP's strategy to eliminate the older members of its workforce in favor of younger workers, when selecting which employee to terminate under its Workforce Reduction Plan, HP's goal is to single out those workers who it thinks "will not fit the bill long term in [the] team growing to [an advisory] position."

48.     Although purportedly neutral on their face, HP's terminations under its Workforce Reduction Plan are actually targeted to discriminate and eliminate older, age-protected workers in grossly disproportionate numbers.  The Workforce Reduction Plan does not take into account performance reviews or evaluations, so the employee selected for the Workforce Reduction Plan is *not* based on merit, but based merely on age.

49.     HP's Workforce Reduction Plan is implemented on a rolling basis.  That is, it does not terminate HP's employees all at once.  But, it serves as a mechanism for HP to terminate members of a protected class of employees whenever it wants.  HP is *still* engaged in the systematic elimination of its Age Protected Class of employees.  That is, the discriminatory acts commenced with the implementation of the Workforce Reduction Plan in 2012 and those discriminatory acts continue to this day, perpetrated by the decisionmakers of HP's Workforce Reduction Plan.

**HP's "Fake" Measures that Purportedly Helped Terminated Employees in the Age Protected Class to Retain Employment in a Different Capacity were Illusory and Restricted Competition.**

50.     Theoretically, HP employees terminated under the Workforce Reduction Plan were and are "encouraged" to apply for other jobs for a limited amount of time.  Specifically, HP has a two-week "Redeployment Period" and a 60-day "Preferential Rehire Period."

51.     During the two-week Redeployment Period, if an employee was able to successfully find a job at HP, s/he would be allowed to continue work without interruption.  If a HP employee was unable to find another job within his/her two-week Redeployment Period, however, that employee enters into the "Preferential Rehire Period."  The Preferential Rehire Period was 60 days.  If an HP employee was hired during the Preferential Rehire Period, then s/he would be rehired without having to undertake the approval process normally required for a rehire.

52.     On or about October 22, 2019, Mr. Cochran was notified by his manager that his employment was being terminated pursuant to the Workforce Reduction Plan, and that his termination date would be November 1, 2019.  Mr. Cochran was presented with a severance agreement and informed he had until December 31, 2019 to sign the agreement and waive/release all of his claims in exchange for $6,903.42.  Alternatively, Mr. Cochran

could choose to not sign the severance agreement, receive no compensation, and still be terminated.

53.    At the time of his selection for the Workforce Reduction Plan, Mr. Cochran was the oldest person in his work group.  On information and belief, the second oldest employee in his team was also selected and ultimately terminated pursuant to the Workforce Reduction Plan.  On information and belief, younger employees that worked in Mr. Cochran's team were reassigned to other departments within HP.

54.     Under the Workforce Reduction Plan, from October 22, 2019 to November 1, 2019, Mr. Cochran had a "Redeployment Period" where he could attempt to transition into a different position without interruption.  But, if he was not redeployed to another position, his redeployment would end on November 1, 2019, and then Mr. Cochran would enter the 60-day "Preferential Rehire Period," where he would be allowed to apply for jobs not yet visible to external candidates, and, *if* hired, not have to undertake the normal approval process required by HP to become an employee.

55.    Mr. Cochran was informed that he would have the two-week deployment period and then the 60-day Preferential Rehire Period to find another job at HP.  If he was able to successfully find another position during that time, then he would be allowed to continue to work without interruption.  If he was not able to find another position at HP within the redeployment period, then he would be terminated and the 60-day "Preferential Rehire Period" would commence.

56.    Plaintiff applied for 40 jobs at HP, including 33 during the Redeployment and Preferential Rehire Period:

   a.  On October 22, 2019, Mr. Cochran applied for the Product Management – Customer Experience Lead position.  He was interviewed on October 24, 2019, but received a follow up email that the job was being filled by another candidate.

b.  On October 23, 2019, Mr. Cochran applied for the Third Party Software Senior Product Manager position.  He was told that HP was looking for someone with 4 or more years of Product Management experience, and informed he would not be offered the job.

c.  On October 23, 2019, Mr. Cochran applied for the Senior Product Marketing Manager for Cloud Data position at HP.  Following his application for this position, he sent two follow up emails on November 25, 2019 and December 10, 2019.  He never received a definitive response.

d.  On October 24, 2019, Mr. Cochran applied for the Microsoft Azure Stack TME position.  On November 25, 2019, Mr. Cochran was informed that the job was filled.

e.  On October 28, 2019, Mr. Cochran applied for the Senior Product Management, Consumption Analytics position.  Mr. Cochran sent follow up emails on November 25 and 27, 2019, and December 10, 2019.  He heard nothing back.

f.  On October 29, 2019, Mr. Cochran Applied for the Corporate Product Service Manager position.  On November 25, 2019, Mr. Cochran was informed that the position had been filled by another candidate.

g.  On October 29, 2019, Mr. Cochran applied for the Solutions Marketing position. He sent two follow up emails on December 17, 2019, and January 9, 2020, and was informed that the position was closed[4] on January 9, 2020.

h.  On October 31, 2019, Mr. Cochran applied for the Storage Product Manager position.  Hearing nothing, Mr. Cochran sent a follow up email on November 25,

---

[4]      "Closed" means Mr. Cochran was not a valid candidate, the job was filled, or the job was cancelled.

2019, and was informed that the position was on hold until February 2020. He has heard nothing definitive since that time.

i.  On November 8, 2019, Mr. Cochran applied for a Senior Product Manager position. He has not been contacted.

j.  On November 10, 2019, Mr. Cochran applied for another Senior Product Manager position. On February 1, 2020, he was informed the position was filled.

k.  On November 13, 2019, Mr. Cochran applied for the ISV Partner Marking Manager position. On December 9, 2019, he was informed that the position was closed.

l.  On November 13, 2019, Mr. Cochran applied for the Business Strategy Manager position. Since that time, he has not heard from HP.

m.  On November 14, 2019, Mr. Cochran applied for the WW 3rd party Maintainer Category Manager position. He was later informed that the position had been closed on January 2, 2020.

n.  On November 14, 2019, Mr. Cochran applied for the GreenLake Process & Capabilities Manager. He was later informed that the position closed on February 25, 2020.

o.  On November 14, 2019, Mr. Cochran applied for a position as HPE PointNext WW Channel Mid-Market/SMB manager. He was later informed that the position was closed.

p.  On November 19, 2019, Mr. Cochran applied for a position as an Information System Architect PointNext. He was later informed that the position had been closed.

q.  On November 20, 2019, Mr. Cochran applied as a HPE GreenLake Channel Hunter. He later was informed that he was rejected as a candidate.

r.  On November 20, 2019, Mr. Cochran applied for the PointNext Information System Architect position.  He has received no definitive response.

s.  On November 21, 2019, Mr. Cochran applied for the Cloud Partner Business Developer position.  He was later informed that the position closed on February 3, 2020.

t.  On November 22, 2019, Mr. Cochran applied for the Senior Global Channel Pre-Solution Specialist position.  He was later informed that the position closed on March 1, 2020.

u.  On November 22, 2019 Mr. Cochran applied for the Adaptive Management Services Business Solutions Manager position.  He was later informed that the position closed January 31, 2020.

v.  On November 26, 2019, Mr. Cochran applied for the Product Manager III position. Not hearing anything back, Mr. Cochran sent a follow up email on December 10, 2019, and was informed that he lacked qualifications because a network engineer would be needed.

w.  On November 27, 2019, Mr. Cochran applied as for the Category Management Representative position.  He was later informed that the position closed on December 16, 2019.

x.  On December 2, 2019, Mr. Cochran applied as a Sr. Technical Marketing Engineer in the Big Data department.  Mr. Cochran followed up a couple times and on December 17, 2019, was informed that HP was hiring another candidate.

y.  On December 3, 2019, Mr. Cochran applied for the Storage Technology Architect. He was later informed that the position closed on December 10, 2019.

z.  On December 3, Mr. Cochran applied for the Channel Technical Program Manager position.  He was later informed that the position closed on December 16, 2019.

aa. On December 4, 2019, Mr. Cochran applied for the PointNext GreenLake Solution Architect.  After numerous telephone calls and emails, he was informed on February 4, 2020 that the position was filled with another candidate.

bb. On December 11, 2019, Mr. Cochran applied for the 3rd Party Software Product Manager.

cc. On December 17, 2019, Mr. Cochran applied for a position as a WW Lead for HPE Hybrid Cloud Support New Service Development.  He is interviewed for the position on December 20, 2019.  The manager of the department verbally informed Mr. Cochran that he wants to hire him at the interview, but he was obligated by HP to interview other candidates.  The manager states that he is willing to work with Mr. Cochran through the HPE exception process.[5]  After several emails, however, Mr. Cochran was informed that the position has been filled on February 18, 2020.

dd. On December 17, 2019, Mr. Cochran applied for the Partner Business Manager for CenturyLink.  He was later informed that the position closed on February 24, 2020.

ee. On December 17, 2019, Mr. Cochran applied for the Composable Go-to-market Program Manager position.  He was later informed that the position closed January 16, 2020.

---

[5]     Under the Workforce Reduction Plan, once the 60 day Preferential Rehire Period expires, the selected employee is no longer eligible for rehire.  The "exception process" is where an employee selected for Workforce Reduction Plan is permitted to be rehired after the expiration of the Preferential Rehire Period.

ff.  On December 17, 2019, Mr. Cochran applied for the Sr. Product Manager for AI/Analytics and SDS Platform Services.  He was never offered the job.

gg. On December 17, 2019, Mr. Cochran applied for the WW Distribution Partner Business Manager position.  He was never offered the job.

hh. On December 17, 2019, with a HP recruiter helping Mr. Cochran to find a job position, Mr. Cochran learned that there are HPE job openings that he might be well suited.  Specifically, the HPE job positions of Sr. Global Channel Pre-Sales Solution Specialist and the WW Distribution Partner Business Manager.  The HP job recruiter attempted to help Mr. Cochran through the "HPE rehire exception process" – a process for approval to look for HP jobs after the expiration of the Preferential Rehire Period. But, Mr. Cochran's application for the HPE Rehire Exception was ultimately denied.

ii.  January 3, 2020, Mr. Cochran reached out to a HP job recruiter who advised him that there might be a position available for which he might be well suited.  But, on January 16, 2020, the HP recruiter advises Mr. Cochran that HP is filling the job position with another candidate.

jj.  On January 7, 2020, Mr. Cochran received a telephone call from a HP recruiter informing Mr. Cochran that HP has a HPE Blue Data Sr. Product Manager position available.  The recruiter further informs Mr. Cochran that she would see if she could take Mr. Cochran through the "executive council exception process" because he would be ineligible for rehire after the Preferential Rehire Period.  Mr. Cochran called the hiring manager, but he informs Mr. Cochran that he will not pursue the exception process.

kk. On February 26, 2020, Mr. Cochran applied for the position of Workstation Technical Marketing Engineer with HPI.  He never heard back about the position.

ll.  On February 27, 2020, Mr. Cochran applied for two separate positions for Software Technical Program Manager with HPI.  He never heard back about these positions.

mm.  On March 23, 2020, Mr. Cochran applied for the position of Worldwide Station Product Manager with HPI.  On March 30, 2020, HPI informed the position had since closed.

nn.  On April 6, 2020, Mr. Cochran submitted applications for two positions at Micro Focus (an HP affiliate) – Technical Success Manager, OpsBridge Suite – Next Gen and the Technical Success Manager, OpsBridge Suite – COSO and Apps – position.  Mr. Cochran subsequently interviewed for these positions.  He did not hear back, so he sent multiple emails to follow up.  Mr. Cochran finally received a response from Micro Focus that the position had been fulfilled with another candidate.

oo.  On July 2, 2020, Mr. Cochran applied for three jobs at Prospecta (another HP affiliate) - IT Asset Management Expert, IT Asset Management Specialist, and Software Asset Manager - CASM position.

pp.  On November 20, 2020, Mr. Cochran applied for the Workstations Tech Marketing position at HPI.  He received rejection notices on December 21, 2020 and January 5, 2021.

qq.  On December 8, 2020, Mr. Cochran applied for the Technology Consultant, Ops Bridge and NOM position at Micro Focus.  He sent an email to Micro Focus that same day.  On January 12, 2021, Mr. Cochran received a rejection notice stating that he would not be offered the position.

57.     HP's discriminatory practices against Mr. Cochran and the Age Protected Class continue to this day.  To wit, they do not rehire members of the Age Protected Class during the Preferential Rehire Period as well as outside the Preferential Rehire Period.

58.     Other HP employees in the Age Protected Class have applied for numerous job positions during the Redeployment and Preferential Rehire Period as well as outside the aforementioned time periods.  Due to its discriminatory practices, however, HP does not hire these individuals, which continue to this day.

59.     While the Redeployment and Preferential Rehire Period is supposedly to be neutral in its application, it is not applied neutrally.  Rather, it systematically targets and adversely impacts disproportionate numbers of age protected employees.

60.     In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired.  If older employees are even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated.  And, worse yet, after the Preferential Rehire Period is over, per HP policy that age protected employee can never be rehired by HP again.  This policy has caused and continues to cause injury to Mr. Cochran.

61.     Moreover, since August 2013, HP's Human Resources Department has incorporated written guidelines that require HP to hire mostly younger employees. Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees."  Thus, HP employees in the Age Protected Class who were terminated under the Workforce Reduction Plan and who sought rehiring under the Preferential Rehiring Period, were fighting an uphill battle against HP's inherent bias to hire a disproportionate percentage of younger "early career" and "recent graduates".[6]

---

[6]     Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

62.     Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs.  Accordingly, age-protected employees were rejected for rehiring under the Preferential Rehire Period provision of the Workforce Reduction Plan in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision.

63.     HP also implemented an early retirement program in which employees of a certain age and tenure are eligible to "voluntarily" retire early.  If the employee does not choose voluntary early retirement, he or she may soon be unemployed.  This retirement program presents age-protected employees with a Hobson's choice: either participate in the voluntary retirement program or risk being terminated under the Workforce Reduction Plan.  The aforementioned dilemma works to HP's advantage and to the Age Protected Class' detriment.

64.     So, in addition to the Workforce Reduction Agreement itself, when the Age Protected Class selected for the Workforce Reduction Plan are looking for jobs they are purposefully deterred from applying because of the job descriptions insinuating that only younger employees would be considered.

65.     Further, HP intends that a number of employees will accede to the early retirement program because those same employees will fear that otherwise they will be selected for the Workforce Reduction Plan.


**HP Has Deliberately Avoided Confronting the Reality that Its Policies Disproportionately Impact Age Protected Employees.**

66.     Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the Workforce Reduction Plan.  By way of illustration, in the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the Workforce Reduction Program.

67.     HP has an "Adverse Impact Team" that evaluates various HP employment practices to determine whether or not those practices impact a significant number or percentage of a particular protected class of employees – *e.g., gender, race, etc.*  Although HP has an "Adverse Impact Team," for unknown reasons, it <u>did not</u> and <u>does not</u> investigate the facts related to whether or not the Workforce Reduction Plan adversely affects a class of *age* protected employees disproportionately.

68.     According to its "HP 2016 Sustainability Report," HP provides workforce data regarding its diversity in the United States, but tellingly provides no facts about its *age*-protected workforce data.

69.     On or about February 2017, HP set forth a "diversity mandate" when it hires outside attorneys to defend it from lawsuits.  If a law firm does not fit HP's selective "diversity" requirements then it can withhold ten percent (10%) of the firm's attorneys' fees. Tellingly, "*age*" is not one of the criteria or factors included in this "diversity mandate."  This omission further evidences HP's devaluation of age-protected class of persons.

70.     According to a January – February 2017 article published by AARP, HP has received more allegations of age discrimination than *any* other technology company in recent years. *See* Exhibit B.


**FIRST CLAIM FOR RELIEF - AGE DISCRIMINATION UNDER ADEA**

71.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

72.     At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

73.     At all times relevant to this case, Defendants were "employers" within the meaning of the ADEA, 29 U.S.C. § 630(b).

74.     The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual about his or her compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 U.S.C. § 623(a)(1).

75.     The ADEA makes it unlawful for an employer to limit, segregate, or classify its employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect her status as an employee, because of such individual's age. 29 U.S.C. § 623(a)(2).

76.     Although Plaintiff has at all relevant times successfully performed his job, he was terminated by Defendants because of his age.

77.     After his selection for participation in the WFR, Defendants then refused to hire Plaintiff for any of the jobs he applied because of his age.  Plaintiff was aptly qualified for each job position he applied for with Defendants.

78.      Defendants' used their WFR plans to disproportionately terminate age protected employees, including Plaintiff.  Then, Defendants' used their "Redeployment" and "Preferential Rehire Period" to disproportionately refuse to hire Defendants' age protected employees and former employees, including Plaintiff.  Defendants' policies, procedures, and practices had a disparate impact on Plaintiff and other age protected employees in violation of the ADEA.  Those policies, procedures, and practices were not based on any reasonable factor other than age.  Further, there was no legitimate, non-discriminatory reason for Defendants' action, and any reasons Defendants may advance are pretextual.

79.     Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under the ADEA based on Plaintiff's age.

80.     Furthermore, Defendants' illegal actions against Plaintiff  were aimed at him because of their age, resulting in adverse impact to the terms and conditions of his employment.

81.     Defendants' above-described conduct was intentional and was motivated by the age of Plaintiff and constitutes a willful violation of the ADEA.

82.     Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiff on the basis of his age.

83.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, and he is entitled to economic damages, and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF - AGE DISCRIMINATION UNDER COLORADO FAIR EMPLOYMENT PRACTICE ACT

84.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

85.     At all times relevant to this case, Plaintiff has been at least 40 years of age and therefore protected by the Colorado Fair Employment Practices Act (C.R.S. 24-34-402).

86.     Although Plaintiff at all relevant times successfully performed his job, he was terminated because of his age.

87.     Furthermore, after his selection to participate in the WFR, Defendants' refused to hire Plaintiff for any of the job positions he applied because of his age.  Plaintiff was aptly qualified for each position he applied to with Defendants.

88.     Defendants' used their WFR plans to disproportionately terminate age protected employees, including Plaintiff.  Then, Defendants' used their "Redeployment" and "Preferential Rehire Period" to disproportionately refuse to hire Defendants' age protected

employees and former employees.  Defendants' policies, procedures, and practices had a disparate impact on Plaintiff and other age protected employees in violation of Colorado law.  Those policies, procedures, and practices were not based on any reasonable factor other than age.  Further, there was no legitimate, non-discriminatory reason for Defendants' action, and any reasons Defendants may advance are pretextual.

89.     Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under the Colorado Fair Employment Practices Act based on the age of Plaintiff.

90.     Furthermore, Defendants' illegal actions against Plaintiff were aimed at Plaintiff because of his age, resulting in adverse impacts to the terms and conditions of his employment.

91.     Defendants' above-described conduct was intentional and was motivated by Plaintiff's age.

92.     Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiff on the basis of his age.

93.     As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, liquidated damages, and attorneys' fees and costs as permitted by law.

## THIRD CLAIM FOR RELIEF – WRONGFUL TERMIANTION IN VIOLATION OF PUBLIC POLICY

94.     Plaintiff incorporates by reference all preceding paragraphs  as if fully set forth herein.

95.     HP discriminated against Plaintiff by terminating his employment of the basis of their age.

96.     HP's discrimination constitutes an unlawful employment practice in violation of Colorado public policy.

97.     Furthermore, Defendants' illegal actions against Plaintiff  was because of their age, resulting in adverse impacts to the terms and conditions of his employment.

98.     Defendants' used their WFR plans to disproportionately terminate age protected employees, including Plaintiff.  Then, Defendants' used their "Redeployment" and "Preferential Rehire Period" to disproportionately refuse to hire Defendants' age protected employees and former employees.  Defendants' policies, procedures, and practices had a disparate impact on Plaintiff and other age protected employees in violation of Colorado law.  Those policies, procedures, and practices were not based on any reasonable factor other than age.  Further, there was no legitimate, non-discriminatory reason for Defendants' action, and any reasons Defendants may advance are pretextual.

99.     Defendants' above-described conduct was intentional and was motivated by the age of Plaintiff.

100.    Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiff on the basis of their age.

101.    As a direct and proximate result of Defendants' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, liquidated damages, and attorneys' fees and costs as permitted by law.

**PRAYER FOR RELIEF**

Plaintiff prays for relief and judgment against Defendants and any later named defendant, jointly and severally as follows:

1.      All damages to which Plaintiff is entitled due to Defendants' conduct, including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discrimination practices of Defendants;

2.      For restitution, including, without limitation, restitutionary disgorgement;

3.      For affirmative or prospective relief;

4.      For exemplary and punitive damages;

5.      For attorneys' fees, expenses, and costs of suit;

6.      For pre-judgment and post-judgement interest;

7.      Awarding such other and further relief, including but not limited to declaratory or injunctive relief; and

8.      For all such other and further relief the Court may deem just and proper.

DATED: June 7, 2022                              **HOGUE & BELONG**

                                        ____s/ *Jeffrey L. Hogue*_____
                                        Jeffrey L. Hogue
                                        jhogue@hoguebelonglaw.com
                                        Tyler J. Belong
                                        tbelong@hoguebelonglaw.com
                                        Attorneys for Plaintiff Cochran
                                        c/o Hogue & Belong, APC
                                        170 Laurel Street San Diego, CA 92101
                                        (619) 238-4720